<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILLIAM NELSON,<br><br>    Plaintiff,<br><br> v.<br><br>INDEGENE, INC.,<br><br>    Defendant. | Civil Action No. 25-01284 (GC) (JBD)<br><br>**<u>MEMORANDUM OPINION</u>** |

**<u>CASTNER, District Judge</u>**

  **THIS MATTER** comes before the Court upon Defendant Indegene, Inc.'s Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6). (ECF No. 9.) Plaintiff William Nelson opposed and Indegene replied. (ECF Nos. 10, 12.) The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Indegene's Motion is **DENIED**.

**I.  BACKGROUND**

  **A.  Factual Background**

  Plaintiff was employed by Indegene from April 18, 2022, until he was terminated on April 14, 2023. (ECF No. 1-1 ¶ 8.) Plaintiff lives in Illinois. (*Id.* ¶¶ 8-9.) Indegene is incorporated in Delaware and its principal place of business is in New Jersey. (ECF No. 1 ¶ 8; ECF No. 1-1 ¶ 10.) Plaintiff served as a "Senior Director, Omnichannel Marketing - Business Development" and worked remotely. (ECF No. 1-1 ¶¶ 8-9.) Plaintiff has an MBA degree from the University of Chicago Booth School of Business and has "two decades of extensive experience in financial

portfolio growth" and "acquisitions and integrations." (*Id.* ¶ 19.) As a Senior Director, Plaintiff reported to the Vice President (VP) of "Biotech Strategy & Business Development" who was also the "Unit [Profit & Loss] Owner." (*Id.* ¶ 20.) The VP reported to a Senior Vice President (SVP)." (*Id.* ¶ 21.) Plaintiff alleges the VP and SVP were "close friends since college." (*Id.*)

Plaintiff alleges that on March 16, 2023, the VP emailed Plaintiff and other employees about a new deal between Indegene and a biopharmaceutical company called Cingulate. (*Id.* ¶ 24.) The deal involved Indegene "supporting Cingulate as they take their ADHD drug . . . to the market." (*Id.* ¶ 26.) The VP valued the deal at "$110M dollars over 5 years." (*Id.* ¶ 27.) The VP's email stated that Indegene's first scope of work for Cingulate was still being finalized but would include "$2.5M to begin work in April." (*Id.*) Indegene issued a press release about the deal and posted it on the company's LinkedIn page. (*Id.* ¶ 28.) Cingulate reported the deal in SEC filings. (*Id.*)

Plaintiff grew concerned about the deal. He determined that "Cingulate's business cannot support" the deal figures because as of March 2023, Cingulate had "only $7.5 million in current assets and cash." (*Id.* ¶ 34.) Accordingly, Plaintiff believed Cingulate "could not possibly pay Indegene the $2.5 million in the first year . . . while satisfying its other obligations." (*Id.*) Plaintiff also alleges that "Cingulate had no revenue, no FDA products to sell, a weak balance sheet, and was in danger of being delisted according to its most recent 8-K." (*Id.* ¶ 35.) Plaintiff further alleges that "Cingulate would have to generate an estimated $1 billion in annual revenues" to make good on the deal "since [Selling, General & Administrative] Expenses are capped at 35% of sales maximum as an industry standard." (*Id.* ¶ 36.) And although Cingulate had FDA approval for an ADHD drug pending, Plaintiff alleges that "FDA and DOJ's limits on ADHD drugs . . . provides for a nationwide cap on production," so "it was a near impossibility and at minimum, highly

improbable for Cingulate to reach such revenue in 2023 or by 2026" even with FDA approval for that drug. (*Id.*) Indegene allegedly knew about Cingulate's financial condition because of a "Fireside Chat" Indegene hosted that Cingulate attended in February 2020. (*Id.* ¶ 41.) Indegene was required to perform due diligence on Fireside Chat attendees, "which would have revealed Cingulate's minimal revenue and prospects." (*Id.*)

Plaintiff determined that "Indegene was attempting to create booked revenue for the Company"—an urgent need given Indegene's financial struggles in early 2023. (*Id.* ¶ 37.) Indeed, despite the fanfare around Indegene's agreement with Cingulate, "Cingulate had no expressed financial commitment to Indegene." (*Id.* ¶ 38.) Plaintiff alleges that, rather, the deal "was a ruse concocted by both companies for their mutual benefit." (*Id.* ¶ 39.) As further support, Plaintiff points to Carlyle Group and Brighton Capital's liquidation of their positions in Indegene "immediately after the deal was announced ahead of the [Initial Public Offering (IPO)]." (*Id.* ¶ 42.) Plaintiff believed that this atypical "fire sale" occurred because investors "also discovered that the revenue was overstated." (*Id.*)

Plaintiff alleges that this "fraudulent statement on behalf of Indegene" adversely impacted investors and affected the company's value in advance of its IPO. (*Id.* ¶ 40.) Plaintiff took his concerns to the VP and SVP in multiple conversations between March and April 2023. (*Id.* ¶¶ 43-45.) Plaintiff alleges that he expressed concern about "an effort to fraudulently book revenue" and about the exclusivity term of the Cingulate agreement, as Plaintiff was "in the final stages of closing two [other] ADHD clients with real revenue, financials and products already in the market." (*Id.* ¶¶ 43, 45.)

On April 14, 2023, Indegene terminated Plaintiff's employment, attributing it to "Position Elimination." (*Id.* ¶¶ 48, 50.) Plaintiff alleges this reason was pretextual and that, instead, Plaintiff

3

was terminated in retaliation for whistleblowing. (*Id.* ¶ 50.) In support of this allegation, Plaintiff alleges that in February 2023, prior to reporting his concerns, the SVP assured Plaintiff that he would be "retain[ed]" by the company "despite the lack of revenues and lost customers" because "it takes 2 years to be successful as a Business Development person." (*Id.* ¶ 52.) Also, in February 2023, Indegene hired an employee who reports to the same supervisor and "performs 90% of the same job duties as Plaintiff." (*Id.* ¶ 50.) Plaintiff further alleges that Plaintiff's firing was retaliatory because as of March 2024, Indegene was actively hiring for at least nine positions similar to his. (*Id.* ¶ 51.)

Plaintiff also alleges that Indegene took "further retaliatory action" when it raised "unwarranted written allegations of confidentiality breach notifications" through counsel in September 2023, after Plaintiff's counsel notified Indegene about his whistleblower activity and allegedly retaliatory discharge. (*Id.* ¶¶ 54-56.)

### B. Procedural Background

Plaintiff initially filed suit in the District Court for the District of New Jersey on April 12, 2024. (ECF No. 1-1 at 4.)[1] Plaintiff brought a claim alleging wrongful discharge under the Sarbanes Oxley Act of 2002 (SOX), as well as two state law claims. On January 10, 2025, the Court dismissed Plaintiff's federal claim without prejudice because Plaintiff had "not alleged whether he exhausted SOX's administrative appeals process," and so "the Court [could not] consider his SOX claims." *See Nelson v. Indegene, Inc.*, Civ. No. 24-4927, 2025 WL 73287, at *4 (D.N.J. Jan. 10, 2025). The Court then declined to exercise supplemental jurisdiction over the remaining state law claims. (*Id.*) The Court directed Plaintiff to refile his federal claim in federal

---

[1] Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

4

court after exhausting the administrative process or to proceed with his state law claims in state court. (*Id.* at *5.) Plaintiff accordingly filed a complaint containing state law claims in state court on February 7, 2025. (ECF No. 1 at 1.) Indegene removed the case to federal court under 28 U.S.C. § 1441(a) prior to service and pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332(a). (*Id.* at 2.)

## II. LEGAL STANDARD

On a motion to dismiss for failure to state a claim, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dir. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III. DISCUSSION

Plaintiff asserts two claims: (1) a claim for retaliatory discharge pursuant to *Pierce v. Ortho Pharmaceutical Corp.*, 417 A.2d 505 (N.J. 1980), and (2) a claim under New Jersey's

5

Conscientious Employee Protection Act (CEPA). Indegene argues that Plaintiff's claims should be dismissed because Illinois law should apply, and Plaintiff cannot state a claim under Illinois law. (ECF No. 9-1 at 13-14.) Alternatively, Indegene argues that even if New Jersey law applies, Plaintiff's claims are duplicative and barred because Plaintiff is not a New Jersey employee entitled to protection under *Pierce* or CEPA. (*Id.* at 15-16.) The Court will address each argument in turn.

A.  **Choice of Law**

Indegene argues that Illinois law should apply to Plaintiff's claims, and that under Illinois law, Plaintiff cannot state a claim.[2] (*See id.* at 13-14.) "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey applies the most significant relationship test, which comprises two questions: whether an actual conflict exists, and, if so, which state has the most significant relationship to the controversy. *See Caspersen ex rel. Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 36 (D.N.J. 2020) (quoting, among other cases, *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008)). If no actual conflict exists, or if New Jersey has the most significant relationship to the causes of action, New Jersey law applies. *See id.* "Choice-of-law determinations are typically made on an issue-by-issue basis."

---

[2]  Indegene's briefing does not address Plaintiff's common law retaliatory discharge claim if Illinois law applies. Indegene asserts that if Illinois law applies, "the Complaint must be dismissed." (ECF No. 9-1 at 13.) But under Illinois law, plaintiffs can bring statutory claims under the Illinois Whistleblower Act (IWA) alongside common law retaliatory discharge claims. *See, e.g.*, *Stiles v. Int'l BioResources, LLC*, 726 F. Supp. 2d 944, 952-53 (N.D. Ill. 2010) ("[A]fter applying the traditional tools of statutory construction that Illinois courts employ when analyzing whether a statute abrogates a common-law cause of action, the Court concludes that the Illinois General Assembly's enactment of the IWA did not abrogate the tort of retaliatory discharge in whistleblower cases.").

*Supreme Oil Co. v. Mass Polymers Corp.*, Civ. No. 15-2344, 2016 WL 8679260, at *4 (D.N.J. Mar. 11, 2016).

### 1. Whether the Laws of Illinois and New Jersey Conflict

"The first inquiry in any choice-of-law analysis is whether the laws of the states with interests in the litigation are in conflict." *McCarrell v. Hoffmann-La Roche, Inc.*, 153 A.3d 207, 216 (N.J. 2017). "A conflict of law arises when the application of one or another state's law may alter the outcome of the case . . . or when the law of one interested state is 'offensive or repugnant' to the public policy of the other." *In re Accutane Litig.*, 194 A.3d 503, 517 (N.J. 2018) (citations omitted).

Indegene asserts, and Plaintiff does not appear to deny, that the whistleblower statutes of Illinois and New Jersey conflict. (ECF No. 9-1 at 13; ECF No. 10 at 14.) Defendant argues that to state a claim under the Illinois Whistleblower Act (IWA), Plaintiff would have needed to allege that he disclosed information to a government or law enforcement agency. (ECF No. 9-1 at 13.) Since Plaintiff disclosed information only to his employer, Defendant argues, Plaintiff cannot state a claim under the IWA. (*Id.* at 11.) Under CEPA, however, Plaintiff could potentially state a claim where he alleges, like he has here, that he disclosed information to a supervisor. *See* N.J. Rev. Stat. § 34:19-3 (2024).

However, the Illinois Legislature amended the IWA in 2024, and the amendments took effect as of January 1, 2025. *See* 740 Ill. Comp. Stat. 174/15 (2024). The Legislature added subsection (c) to section 15 of the IWA, which broadened the reach of the Act to encompass disclosures made not only to government or law enforcement agencies, but also "to any supervisor, principal officer, [or] board member," among others. *Id.* 174/15(c). In addition, while the IWA formerly required an employee to have "reasonable cause" to believe that their employer violated the law, it now requires only a "good faith belief." *Compare* 740 Ill. Comp. Stat. 174/15 (2023),

*with* 740 Ill. Comp. Stat. 174/15 (2024). Under CEPA, however, employees must "reasonably believe[]" that a violation of law occurred. N.J. Rev. Stat. § 34:19-3 (2024). As such, the amended standard under Illinois law appears more relaxed than that of New Jersey.

The Illinois Legislature stated in the Act amending the IWA that "[t]he changes made by this amendatory Act of the 103rd General Assembly apply to claims arising or complaints filed on or after January 1, 2025." 2024 Ill. Legis. Serv. P.A. 103-867 (H.B. 5561) (West). Here, the claims arose prior to January 1, 2025, and Plaintiff first commenced an action involving these claims on April 12, 2024. However, the operative pleading in this case was filed on February 7, 2025. The parties did not brief the issue of which version of the IWA should apply. But because a conflict between CEPA and the IWA exists, regardless of which version applies, the Court will move to step two of the choice of law analysis for Plaintiff's CEPA claim.

Plaintiff also brings a common law wrongful discharge claim under *Pierce*. *See Pierce*, 417 A.2d at 512 (holding that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy"). Illinois recognizes a similar common law retaliatory discharge claim. *See, e.g.*, *Young v. Rivian Auto.*, 2025 WL 2163750, at *2 (C.D. Ill. July 30, 2025) (citing *Turner v. Mem'l Med. Ctr.*, 911 N.E. 2d 369, 376 (Ill. 2009)) (recognizing common law claim where a plaintiff alleges "(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy"). Although there does not appear to be a conflict, the parties do not directly address or discuss whether one exists. "Out of an abundance of caution and given the parties' limited briefing on this issue," the Court declines to rule at this time on whether a conflict exists as to Plaintiff's common law claim. *Everest Indem. Ins. Co. v. All Risks LTD*, Civ. No. 16-3582, 2023 WL 4295778, at *8 (D.N.J. June 30, 2023); *see also Affordable Dentures-Audubon, Michelle*

8

*Aitken, DDS, P.A. v. Affordable Care, LLC*, Civ. No. 17-12136, 2018 WL 2134037, at *10 (D.N.J. May 9, 2018) (declining to rule on a choice-of-law issue in the absence of briefing); *Amato v. Subaru of Am., Inc.*, Civ. No. 18-16118, 2019 WL 6607148, at *20 (D.N.J. Dec. 5, 2019) ("Because [d]efendants fail to sufficiently explain a conflict between laws of the relevant jurisdictions, the [c]ourt finds that it is premature at this stage to engage in a conflict of laws analysis."). The Court will therefore proceed to the second step of the choice-of-law test as to Plaintiff's CEPA claim.

### 2. Whether New Jersey Has the "Most Significant Relationship" to the CEPA Claim

The second step in a choice-of-law analysis considers which state has the "most significant relationship" to the claims in question.[3] New Jersey courts rely on the Restatement (Second) of Conflict of Laws to guide the "most significant relationship" standard. *Camp Jaycee*, 962 A.3d at 455. Specifically, courts look to sections 145 and 146 of the Restatement for general principles regarding conflicts involving tort claims and to section 6 of the Restatement for "universal principles" of choice-of-law issues. *Donovan v. W.R. Berkley Corp.*, 566 F. Supp. 3d 224, 234 (D.N.J. 2021). This step is "fact-intensive" since "[e]ach choice-of-law case presents its own unique combination of facts—the parties' residence, the place and type of occurrence[,] and the specific set of governmental interest[s]—that influence the resolution of the choice-of-law issue

---

[3] The Court notes that under New Jersey's choice of law analysis, an interim step is to determine, pursuant to section 6(1) of the Restatement (Second) of Conflict of Laws, whether the New Jersey Legislature has issued a choice-of-law directive "that compels our courts to apply New Jersey law . . . rather than conflicting out-of-state laws." *See Calabotta v. Phibro Animal Health Corp.*, 213 A.3d 210, 222 (N.J. Super. Ct. App. Div. 2019). Although the Appellate Division in *Halliday v. Bioreference Laboratories, Inc.* stated that "CEPA is devoid of a statutory directive concerning choice-of-law issues and it is bereft of any suggestion the Legislature intended that the statute preempt the otherwise applicable choice-of-law analysis," the parties did not brief this issue. No. A-3219-19, 2022 WL 3051348, at *13 (N.J. Super. Ct. App. Div. Aug. 3, 2022). Accordingly, the Court does not rule on this issue at this time and instead will address it upon further consideration of the most significant relationship test discussed *infra*.

presented." *Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 490 (D.N.J. 2009) (quoting *Warriner*, 475 F.3d at 500).

Section 146 instructs that the law of "the state where the injury occurred determines the rights and liabilities of the parties" absent another state with a more significant relationship. *Calabotta v. Phibro Animal Health Corp.*, 213 A.3d 210, 219 (N.J. Super. Ct. App. Div. 2019) (quoting Restatement (Second) of Conflicts § 146). To analyze such a relationship, section 145 outlines certain contacts courts must consider: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflicts § 145(2). Finally, section 6 includes "non-exclusive general factors to be considered," *Calabotta*, 213 A.3d at 220 (citing Restatement (Second) of Conflicts § 6(2)), including "(1) interests of interstate comity; (2) interests of the parties; (3) interests underlying the field of law; (4) interests of judicial administration; and (5) competing interests of the states," *Supreme Oil Co.*, 2016 WL 8679260, at *5 (citing *Camp Jaycee*, 962 A.3d at 463). Amid these many considerations, New Jersey courts "focus on the considerations that 'are relevant to the purposes of the particular laws in conflict.'" *Walters v. Safelite Fulfillment Inc.*, No. 21-2054, 2022 WL 15377887, at *4 (3d Cir. Oct. 27, 2022) (citing *Fu v. Fu*, 733 A.2d 1133, 1142 (N.J. 1999)).

Despite this guidance, the Court finds that there is good cause to refrain from determining which state's law should apply to Plaintiff's CEPA claim at this stage. First, the parties' briefs make clear that important factual disputes exist, and resolution of these disputes would inform the Court's analysis of which state has the most significant relationship. For example, Indegene raised factual issues purportedly unaddressed in Plaintiff's Complaint regarding ties between Plaintiff's

allegations to New Jersey, including pertinent locations of key people for key events. (ECF No. 9-1 at 18-19.) Such facts would inform the Court's analysis, as, for example, the Court must consider "the place where the conduct causing the injury occurred." Restatement (Second) of Conflicts § 145(2)(b). The parties further dispute whether Plaintiff was an employee of New Jersey or Illinois, the resolution of which would inform which state has the most significant relationship to the claims. *See* ECF No. 9-1 at 19 ("Mr. Nelson does not allege (and presumably cannot allege) that he was a New Jersey employee."); ECF No. 10 at 18 ("Plaintiff Nelson is a New Jersey employee[.]").[4]

Second, the Court recognizes that Plaintiff's CEPA claim involves somewhat novel issues regarding the realities of remote work. *See Schulman v. Zoetis, Inc.*, 684 F. Supp. 3d 275, 281-82 (D.N.J. July 14, 2023) (noting the New Jersey Supreme Court has not ruled on whether CEPA applies to remote workers but noting affirmatively the Appellate Division's holdings in *Halliday v. Bioreference Lab'ys, Inc.*, No. A-3219-19, 2022 WL 3051348, at *12 (N.J. Super. Ct. App. Div. Aug. 3, 2022), and *Calabotta*, 213 A.3d at 229-30, that found out-of-state employees could bring claims under New Jersey law). Accordingly, a more fulsome record should be developed before determining which state's law should apply. Therefore, the Court finds that it would be premature at this stage to determine, based solely on the pleadings, which state has the most significant interest in Plaintiff's claims, and it declines to do so. *See Supreme Oil Co.*, 2016 WL 8679260, at

---

[4] Indegene also argues that *Halliday*—Plaintiff's principal case in support of New Jersey having the most significant relationship—is distinguishable because the plaintiff in that case "alleged extensive links" tying the claim to New Jersey, unlike Plaintiff here. (ECF No. 9-1 at 21.) However, *Halliday* was decided on a motion for summary judgment, and, as such, the court's decision was based not on the allegations in that complaint, but rather on the full record before the court. *See* 2022 WL 3051348, at *1. What's more, the Appellate Division in *Halliday* vacated the trial court's order and remanded the case to resolve factual issues related to the trial court's choice of law analysis. *Id.* at *18. At this stage, the Court cannot fully analyze *Halliday*'s application to this case without a more fulsome record.

\*5 (declining to determine which state has the most significant interest "prior to sufficient development of the factual record"); *Law v. Virtus Partners Holdings, LLC*, Civ. No. 22-2329, 2023 WL 2245039, at \*4 (D.N.J. Feb. 27, 2023) (concluding that a choice-of-law analysis at the pleading stage was premature and could not "be properly evaluated until after the factual record has been developed").

### B.      Defendant's Arguments Under New Jersey Law

Indegene makes two arguments assuming that New Jersey law applies. (ECF No. 9-1 at 14-15.) First, Indegene argues that, under New Jersey law, a plaintiff cannot bring both *Pierce* and CEPA claims. (*Id.* at 15-16; ECF No. 12 at 6-8.) Second, Indegene argues that even if the claims are not duplicative, Plaintiff has not adequately "invoke[d]" New Jersey law as Plaintiff is a resident of Illinois. (ECF No. 9-1 at 16-19.)

#### 1.      Whether Plaintiff's Pierce and CEPA Claims Are Duplicative

As the Court noted in its prior opinion, Plaintiff cannot assert claims under both *Pierce* and CEPA. *Nelson*, 2025 WL 73287, at \*4 n.5. Indeed, in *Young v. Schering Corp.*, the New Jersey Supreme Court held that CEPA's waiver provision—which prevents litigants from pursuing certain non-CEPA claims—"applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA." 660 A.2d 1153, 1160 (N.J. 1995). However, this Court did not fully analyze the overlap between Plaintiff's two claims because it dismissed the Complaint after finding infirmities with the sole federal claim and declining to maintain supplemental jurisdiction over the remaining state law claims. *See Nelson*, 2025 WL 73287, at \*4 ("As the Court has dismissed Plaintiff's SOX claim, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims."). Therefore, the Court had no need to—and did not—address *when* in the litigation process this waiver should apply. Here, because the same alleged retaliatory conduct forms the basis of Plaintiff's CEPA and *Pierce* claims, the Court will address the issue.

Since *Young*, courts have wrestled with this question. CEPA reads, "[T]he institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J. Rev. Stat. § 34:19-8 (2024). To date, the New Jersey Supreme Court has not construed what the term "institution" means, although it commented in *Young* that the term could be "susceptible of meaning something other than the filing of a complaint" and "could conceivably contemplate an election of remedies with restrictions in which the election is not considered to have been made until discovery is complete." 660 A.2d at 1161.

The Appellate Division took up this question in *Maw v. Advanced Clinical Comms., Inc.* There, the court analyzed the plaintiff's attempt to bring both a CEPA and a common-law claim for wrongful discharge related to whistleblower activity. 820 A.2d 105, 117 (N.J. Super. Ct. App. Div. 2003), *rev'd on other grounds*, 846 A.2d 604 (N.J. 2004). The question before the court was "not whether plaintiff ultimately may bring both a common-law claim and a CEPA claim—plaintiff acknowledges that she must elect one or the other—but rather at what point must plaintiff make the election." *Id.* Looking to the New Jersey Supreme Court's commentary in *Young*, the court concluded that "before electing remedies, a plaintiff should have an opportunity to complete discovery." *Id.* at 118. Although the Supreme Court later reversed the Appellate Division's decision in *Maw*, it did so on other grounds. *See* 846 A.2d at 607-08.

Since then, it is true that some courts have applied waiver at the pleading stage and dismissed *Pierce* claims. *See, e.g.*, *Keaton v. Argo Turboserve Corp.*, Civ. No. 17-3978, 2021 WL 3879091, at *10 (D.N.J. Aug. 31, 2021) (dismissing *Pierce* claim because the "[p]laintiff waived his right to assert such a claim by bringing a CEPA claim"); *Rodriguez v. Ready Pac Produce*, Civ. No. 13-4634, 2014 WL 1875261, at *11 (D.N.J. May 9, 2014) ("Plaintiff has waived his right to

13

make a wrongful termination claim under New Jersey common law by filing a claim under CEPA."); *Hillburn v. Bayonne Parking Auth.*, Civ. No. 07-5211, 2009 WL 777147, at *2-3 (D.N.J. Mar. 20, 2009) (looking to the plain text of the statute to determine waiver occurs when an action begins). However, a number of other courts have held that no claim should be waived until discovery is complete to give the plaintiff time to properly "elect" remedies. *See, e.g.*, *Hussain v. Allies, Inc.*, No. A-1532-23, 2025 WL 1156055, at *6 (N.J. Super. Ct. App. Div. 2025) (holding waiver applies after discovery so that plaintiff can "make a knowing and meaningful election of remedies"); *Rubin v. Sultan Healthcare, Inc.*, Civ. No. 08-6175, 2009 WL 1372272, at *4 (D.N.J. May 15, 2009) (predicting that the New Jersey Supreme Court "would hold that the CEPA waiver provision would not require a plaintiff to elect her remedy at the pleading stage of the litigation but rather defer the waiver until the plaintiff has had an opportunity to conduct discovery"); *Curro v. HD Supply, Inc.*, Civ. No. 19-19198, 2020 WL 3496955, at *5-6 (D.N.J. June 29, 2020) (summarizing CEPA waiver law and refusing to waive a common law claim at the pleading stage). Persuaded by the reasoning in *Maw*, commentary in *Young*, and reasoning of other courts in holding that the waiver should not apply at the pleading stage, the Court will not dismiss Plaintiff's *Pierce* claim as duplicative at this early stage of the litigation.

### 2. Whether Plaintiff's Claims Are Sufficient

Finally, Indegene does not challenge the sufficiency of Plaintiff's claims under New Jersey law except to argue that Plaintiff cannot "invoke" New Jersey law because he "does not allege (and presumably cannot allege) that he was a New Jersey employee," as Indegene argues is required to assert Plaintiff's claims.[5] (ECF No. 9-1 at 16-19.)

---

[5] While some courts have outright denied motions to dismiss after finding a choice-of-law analysis inappropriate, *see, e.g.*, *Cilluffo v. Subaru of Am., Inc.*, Civ. No. 23-1897, 2024 WL 1270814, at *5 (D.N.J. Mar. 26, 2024), others have proceeded applying the law a plaintiff uses to present their claims, *see e.g.*, *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011).

CEPA defines an "employee" as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." N.J. Rev. Stat. § 34:19-2 (2024). As such, the text does not explicitly limit its application to individuals in New Jersey. Indeed, Indegene notes that "there is no dispute here that New Jersey law *can* apply to out-of-state employees like Mr. Nelson." (ECF No. 9-1 at 20 (emphasis in original).) After all, the New Jersey Supreme Court has held that CEPA "should be construed liberally." *Donelson v. DuPont Chambers Works*, 20 A.3d 384, 391 (N.J. 2011) (quoting *Dzwonar v. McDevitt*, 828 A.2d 893, 901 (N.J. 2003)). The Supreme Court has also noted that it has "extended the reach" of the definition of "employee" in CEPA, "not restricted it." *Lippman v. Ethicon, Inc.*, 119 A.3d 215, 226 (N.J. 2015). Further, CEPA "signals a clear statement of public policy in wrongful-discharge cases." *D'Agostino v. Johnson & Johnson, Inc.*, 628 A.2d 305, 311 (N.J. 1993). It is no surprise, then, that courts in New Jersey have found that employees who work outside of New Jersey can bring CEPA and wrongful termination claims. In *Halliday*, the Appellate Division concluded in resolving a motion for summary judgment that it was "persuaded CEPA is sufficiently broad to extend to [Texas-based] plaintiff as an employee of a New Jersey corporation that is also headquartered in this State." 2022 WL 3051348, at *12. And in *Calabotta*, the Appellate Division concluded that the Legislature "did not intend to confine the scope of the [New Jersey Law Against Discrimination] solely to plaintiffs and claimants who reside in [New Jersey]," adding in a footnote that CEPA is an analogous statute. 213 A.3d at 225 n.10. Moreover, in *D'Agostino*, the Supreme Court determined that a Swiss resident could bring a wrongful termination claim against a New

---

Because Plaintiff here pleads claims under New Jersey law, and because Indegene avails itself of New Jersey law to make the argument addressed in this subsection, the Court also applies New Jersey law in its analysis for purposes of this Motion.

15

Jersey company. 628 A.2d 305, 320-21 (N.J. 1993). As such, the location of Plaintiff's workstation is not dispositive of whether Plaintiff's claims can proceed.

Here, Plaintiff has alleged that Indegene has a headquarters and principal place of business in New Jersey with no offices in Illinois and that "[a]ll of Plaintiff's direct supervisors and Indegene's human resources who had decision-making control over the terms and conditions of Plaintiff's employment were at all relevant times located in New Jersey." (ECF No. 1-1 ¶¶ 10-12.) Plaintiff alleges that he "worked remotely for the company's headquarters located in . . . New Jersey." (*Id.* ¶ 9.) Drawing all reasonable inferences in favor of Plaintiff as the Court must on a motion to dismiss, the Court finds that Plaintiff has sufficiently alleged that he is an employee for purposes of stating his claims. *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 305 (3d Cir. 2005) ("On a motion to dismiss, we will draw all reasonable inferences in favor of the plaintiff.").

Because Indegene makes no additional arguments about the sufficiency of Plaintiff's claims and because "[w]hen presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim," the Court ends its inquiry. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016).

## IV.  CONCLUSION

For the foregoing reasons, and other good cause shown, Indegene's Motion to Dismiss (ECF No. 9) is **DENIED**. An appropriate Order follows.

Dated: November 6, 2025

_____
GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE